Our next case is Snapp v. Lincoln Financial Securities. Mr. Greco, when you're ready. Yes, Your Honor. May it please the Court. I'm Scott Greco. I represent Snapps in this case, Betty and Alfred Snapp and their daughter-in-law, Sharon Snapp. This is a case where the district court dismissed this matter based upon statute of limitations, among other rulings. And the underlying theory behind the district court's dismissal was that it was unreasonable for my clients, the Snapps, to rely upon their investment professional, to rely upon the financial advisor they had gone to with their life savings to get advice on investing it in a manner that would allow them, as most retirees want, to allow them to have income for the rest of their lives, as well as keeping and preserving the principle of their investments, to pass on to their heirs. The representative, Mr. Watts, who worked for Lincoln Financial, represented to them that they could, through this variable annuity that he ended up selling them, achieve this goal. That they can take out a certain amount of money, which he helped them set these amounts, that they can take that out for the rest of their lives and they'd still have, at the end, this death benefit, this value, that was the original amount that they had put in, which for Betty and Alfred was around $370,000. For Sharon, who had a separate transaction, I believe it was around $224,000. It turned out to be not true what Mr. Watts represented in terms of what this investment would do. The Snapps repeatedly received statements, as you'll hear from counsel, that they maintain should have put the Snapps on notice, that these representations were not true. But they did ask about this, as a reasonable person would, went to their investment professional, and again, I use that term because that's what both River Source and Lincoln Financial referred to him as a professional, someone who they can rely upon for advice. Well, let me ask you this, as to the fraud claims, there is a discovery rule that controls them. So what's your best argument as to when you were on notice? We maintain that it was not until after Mr. Watts committed suicide and among other problems in relation to a lot of his accounts, the Snapps started looking into these and started speaking to other people about these particular variable annuities. And that was late 2015. I think he passed away in approximately November 2015, and it was shortly after that. So during the period of time prior to that, certainly there is a discovery rule. The statute's very clear that it stays, the fraud claims, in terms of statute of limitations, until it's discovered or should have been discovered. And certainly there's a sort of a reasonableness standard, and I think it uses the word reasonable there. And that's what Lincoln argues and what the district court found was that my clients were not reasonable because when they did ask questions about this, they asked their investment professional, the person they relied upon, the only person they knew at the establishment. Can I ask a procedural question here, which just may reflect my lack of civil experience? But it seems odd to me, but the actual annuity contract is not included in the motion to dismiss briefing. Correct, Your Honor. And so it's not before us, it's not among the exhibits, it's not part of the record. The contract is not, Judge. We did not attack Patrick's complaint. And really the issue is not so much what, you know, any dispute as to what contract provisions mean in it. The dispute is what they were told that this annuity contract provided. And then obviously we have statements that were certainly in the appendix. And I would certainly urge the panel to look at page 100, which is sort of the monthly statements they would get, which has a number of approximately four, five, six, seven, eight different numbers. And the staffs were supposedly, according to the district court, supposed to be on notice immediately upon getting that, that what they're being told was wrong. Well, no, no. But the district court said they were on inquiry notice. The statement should have at least raised questions. And they did, right? I mean, your clients did in fact have questions. So can we really argue about at this point whether they were on inquiry notice, given that they inquired? We don't dispute that they should have inquired and they did inquire, obviously. So the district court held that there'd be no tolling under any of these various doctrines and or they should have discovered it earlier because first, they were on inquiry notice. And second, once they were on notice, they weren't reasonably diligent in pursuing questions. So, so you agree with the first part, but disagree with the second part. Strongly with the second part. OK, but you're on board with the first part. They were on inquiry notice. We didn't put it in our complaint that they had questions when they looked at these statements. All right, so this is about whether once they have questions, they have to do more than ask their broker. OK, and Judge, I think it's page 170 of the appendix gets to this issue of who should they have asked. Certainly the district court thinks, and Lincoln and Riversource. I want to hear this answer, but just in your words, they were on inquiry notice of what? Of potential fraud or contract, either a contract or a fraud claim, right? I wouldn't go that far. They are on inquiry notice that the number, the value of their annuity, there were there were numbers that were declining on their statements. We don't dispute that. But the inquiry that they have is that either the promise was wrong or the product was wrong, right? I mean, that they have to be on inquiry of something, right? I mean, that's the whole point of inquiry notice. And their inquiry notice here, I'm trying to understand, it's either a contract or a fraud claim. I mean, is that what your point is, is that the claim here that they're on notice of is either a contract or a fraud issue? We maintain it's a fraud issue because they were told when they were sold this product that the original value, the money they're putting into it, is not going to decline. And they're going to have this death benefit at the time they die. That's going to be the full value. And that's supported. And this is something the district court didn't. No, no. Can I stop you there? If what they're on notice of is the fraud part of it, that maybe this promise was not true, just as a matter of common sense, how can it be reasonably diligent then to ask the person, you're on notice that this person might have lied to you. How can it be reasonably diligent to ask that person, were you lying to me? Shouldn't you ask someone else? That's who River Source told them to ask, how to contact them. Well, I understand that, but shouldn't they have, given that they were on notice that this person is a potential big liar, doesn't common sense sort of indicate that reasonable diligence would be checking up on him, not asking him? Judge, common sense would assume that if one looked and looked, as he told them, that they had a guaranteed value, and you look at these statements, they have a separate number that has a guaranteed death benefit value. The question is, why do they have a guaranteed death benefit value that's not actually the amount of money you're going to get on your death benefit, which I think goes to the issue of whether they were reasonable or not. He says, no, look, you don't look at that number. You look at this number. And there is a number on the statements. It says $370,000, and it continues throughout that this is the guaranteed death benefit. But it turns out they found out later, after 2015, that that's not actually true. Shouldn't we also, in evaluating sort of the reasonableness of their reliance, I mean, you know, as I understand these annuities, at least as you claim they were represented, they represented that they were going to get, and I think the math is a little over 7% guaranteed return. For their life. Plus 100% of the principal upon their death. Yes, right, which certainly a sophisticated, maybe anybody, but certainly a sophisticated person in 2007, 2008, where treasuries are below 4%, and that would be a remarkable deal, like one might say, like a too good to be true type of a story. Don't we have to take that into account as well, that they were on notice that they've got a remarkably good deal. They're pulling this out of an investment. So they had a previous investment, at least one of your clients had a previous investment, and so they're pulling it out of that deal, which could not have been nearly as good as this deal, because nobody would have sold the deal that you suggest was actually provided. And so they know they're in a situation where it's too good to be true. And then they start getting the statements that reflect it probably is too good to be true. And this is to Judge Harris's point, that a reasonable person wouldn't just inquire of the person who sold it to them, they would inquire beyond that. Judge, I'd first respectfully disagree that my clients reasonably should have been on notice that this deal was too good to be true. Seven percent, perhaps a judge, an attorney, a financial professional may realize that that's a high percentage. My clients are apple farmers. The fact that they somehow should have known that small business owners, small business owners. But the fact that they should somehow have known that this man they go to for financial advice is lying to them to tell them that this is what they can get. I would strongly disagree with that. And again, they're going to the professional. It's not they certainly can go invest on their own. They could open a Scottrade account if they wanted to, if they were sophisticated enough to know what is or isn't a good deal. They went to the man that was supposedly a professional to get advice. And he told them this. And it's important to note in the complaint, we note the amount. And again, really what's this tied to is the amount of money they were taking out per month. This would have worked out if they had taken out less money per month because they would have been able to keep these guaranteed values. But what happened was, as we allege, the individual, Mr. Watts, set these amounts and he should have known better. And he probably did know better. But he set the amounts that they were taking out per month. It's not a situation where they went and said, I demand that I've got to have this amount. He said, you can take this amount out every month and still keep your principle. And they relied upon that. And I would note in terms of the issue of who they contacted and when they contacted, they also contacted the 800 number. As we allege, we filed a supplement. The court ultimately said that she did take that into account. And when they contacted the 800 number, they were told to go contact their investment professional. So the premise that they somehow should have called an 800 number and spoken to someone else rather than a person who's in Winchester down the street from them, who's their investment professional, who's been there for years, who they trust, that somehow they should have been on notice that they can't trust them anymore. And should call someone that doesn't even have a name. It's just an 800 number. I would submit it's not reasonable. I'd also mention on the reasonableness issue, there's multiple other arguments in terms of delays in the statute of limitation. We certainly briefed them. But I wanted to point out that the obstruction argument 8.01229D addresses indirect or direct means to obstruct the filing of a claim. And there's no reasonableness requirement in that code section. Can I tell you my concern here? I do understand your argument. We see so many cases where we have an alleged fraud that's incredibly well hidden. I mean, it's both really complex and really well hidden. It's not showing up on the statements. You can ask a lot of people what's going on. No one's going to tell you. I mean, these are really hard to discover. And even then, you know, there's always questions about, well, should the plaintiff have done a little more? Wasn't there someone they could have called? Surely if they had, like, you know, gone back and read all of the fine print from 10 years ago, they might have been tipped off that there was something not quite right. And this looks nothing like that, right? This one is just it's right there on the statements. All you had to do, it turns out, was talk to the guy in the one office over. This was a pretty easy fraud to uncover. And so in light of that, is your sort of main counter argument that what is what's your main response to that? These statements say guaranteed. And I would submit that guarantee is reasonable to assume. Guaranteed means guaranteed. But they didn't assume that, right? But they didn't. Death value is $370,000. Yeah, but they didn't assume that it might have been reasonable. But it's just sort of an odd posture in that, actually, they were sophisticated enough to read these statements and say, whoa, something's not right here. I would say this is not a checking account where you have a balance. You have checks, deposits. I appreciate that. I looked at the statements. I personally was sort of baffled by them. But apparently your clients weren't. They did know that this doesn't look, it's not matching up with the promise that was made. And they asked the person that they trusted, who's down the street. But why did they trust him at that point? Because they already were, as you conceded, were on inquiry notice that they had a possible fraud on their hands. Because he said they had a guaranteed value of $370,000 and the statements confirmed that. Last point I want to make, I only have two minutes left. On the negligence issue, just in general, whether or not my clients have a claim for negligence against their investment professional and the firms that he was an agent for. The position of the District Court in Lincoln and Riversource is that we can't bring a negligence claim against a financial advisor and investment professional. Because none of the insurance regulations, statutes, the FINRA rules which govern security sales, none of those provide standard care that was binding upon these individuals. In this case, individual firms that he was an agent for. And I would submit that that's not the state of the law. That, again, they held him out as a professional, just like an attorney's professional, just like a doctor's professional. Yet the position of the District Court is that there's no standard of care that he could be held to that we can claim that negligence claim. Are there Virginia cases holding this kind of financial professional to a duty of care to their clients? I just, there aren't any that do and there aren't any that don't as far as I'm aware of.  I would submit one of the reasons is that virtually all the securities-related cases in the last 30 years are required to get arbitration through FINRA. So there's really not a lot of case law in that area. Unfortunately for me, I do feel this type of work. We did cite some cases from some other districts and a New York case as well that have found this. I would submit there has to be some duty of care for a professional providing advice. But we can't really do that sort of sitting in diversity jurisdiction. Tell Virginia, look, you really need to wake up to this problem and impose a duty of care. There are Virginia cases that make very clear, just read the one, the Kautland case that we had cited. The law of tort provides redress only for the violation of certain common law and statutory duties involving the safety of persons and property, which are imposed to protect the broad interests of society. So certainly the standards of care set out in various insurance regulations about suitability, about not making misrepresentations and in the securities rules that say you have to make a suitable recommendation to your customer. Those certainly are duties of care that are in the industry, that are out there. We have Virginia-specific regulations and that duty of care is clearly for the protection of people like my clients. And therefore, it should be imposed on the independent resource. Thank you very much. Yes, Mr. Mahoney. Good morning and thank you. May I please the court, Liam Mahoney, on behalf of the FedEx Appellees. Thank you very much for pointing out what I was going to argue as the central point here. And it calls to mind what Ronald Reagan once said in dealing with the Russians, trust but verify. I don't quibble with Mr. Greco saying at some point, certainly at the point of sale, that the snaps trusted Mr. Watts, their financial advisor. But there came a point in time, and it wasn't all that long later, they bought these annuities in late 2007, the snaps did, and their daughter-in-law, Sharon Snap, bought her annuity a month or two later in early 2008. As Judge Dillon found, by no later than late 2009, every quarterly statement that they received, not from Mr. Watts, but from the actual company that sold them the annuity, River Source. That showed unquestionably that what Mr. Watts had told them, your value will never go down, your debt benefit will never go below the exact dollar amount that you paid me on day one, was at least suspect, if not flat out untrue. Now, to your point, Judge Harris, this is not a hypothetical where someone should have been on notice. An inquiry notice is, of course, the standard for pretty much all of these issues. There's no question that the statutes have run. The real issue here is, is there any doctrine, whether it be the Discovery Rule or one of the other equitable doctrines that Mr. Greco relies upon, do they operate to toll what otherwise would have clearly run years before their filing date? Here, they were on notice, and they knew it. The complaint specifically says, not just once, repeatedly, when they would receive their statements from River Source, they would call up or go visit Mr. Watts. And it was almost like Groundhog's Day to read the complaint. And Mr. Watts would say, basically, who are you going to believe, me or your own eyes? Well, in fairness, I'm looking at the statement. I mean, for someone who is not a sophisticated financial person, and I'll put myself in that category, it's really kind of baffling. And it does say your guaranteed benefit amount has not gone down. Your Honor, it actually, it doesn't say that, but I agree with you. It's not the most intuitive. Maybe you can walk me through it where it says guaranteed benefit amount. Is that number going down over time? That number remains the same. Okay. Okay. And I can explain to you what it is, but for these purposes. You could, but let's assume, right, I didn't have the benefit of your insight as I was reading it. Yeah. And that would be a fair argument if, in fact, the SNAP said, you know what? Every time we got the statement, we only looked at this line item, or better yet, Mr. Watts told us only to look at the guaranteed benefit. I will point out- Isn't that what he did tell them when they talked to him? No, it is not. You won't see the word guaranteed benefits and Mr. Watts anywhere in the complaint. There's no allegation that Mr. Watts ever said to them, only look at this. In fact, what they allege is with regard to Sharon Watts, he said in the complaint, ignore the bottom part of your statement. That's ironically, that's exactly where this guaranteed benefit language is, from the bottom of the statement. But whether it would be confusing to you or to me or to another investor, as you pointed out earlier, it wasn't confusing. I didn't point it out. I'm just asking questions. So my question to you is, why isn't it a perfectly reasonable position that, yeah, this thing raises questions. It would raise questions for anyone. It's totally confounding. So they call their guy and the guy's like, let me explain it to you. It's all fine. What I told you was right. And if you read it my way, it's right. That seems like that would be a plausible way to understand what happened here. It would be if that's what was alleged. Well, they do allege that he told him, he told them that his promise was in fact true and that the document could be read in a way that made his promise true. Okay. But they plainly did not take comfort in that. And I say that because if they had, you would expect a reasonable person having been told that first time. Maybe the second time would say, you know what? I trust him.  I don't have to worry about it. It seems sort of unfair that they're in a worse position because they were more diligent and kept asking for explanations. Do you know what I'm saying? You're saying if they had just been like, eh, fine. They were diligent because they kept going back to the same source that is providing them with questionable information. What they have on the one hand is a statement from the company that says, X, your values are declining quarter after quarter after quarter, year in and year out. On the other hand, you have the gentleman who verbally told you at the beginning and just simply repeats the same thing every time when you question him because you're concerned that, wait a minute, you're telling me X, you told me this last quarter and now my value is down even more. Can I, can I, I'm sorry, this is my last question. No, please. So do you want us to hold as a matter of law, no jury could find otherwise, an unsophisticated investor does not exercise due diligence once they're on inquiry notice by talking to his or her broker about an investment and their financial statements, that that is per se insufficient or is there a narrower ruling? No, I think it's narrower. I think it's, and I believe the case law says it's under the circumstances. Okay, and which are the circumstances that you would. The circumstances here are that you have investors who were lied to according to the complaint. They're on inquiry notice, an actual notice. They go to their, the same person who lied to them or potentially lied to them and do nothing more. Now, ironically, the complaint says they do nothing more. After oral argument before Judge Dillon, we received a, I guess, I think it was a supplemental brief. Yeah, but can I just bring you back? So that's pretty much what I asked you. So as a matter of law, an unsophisticated investor on inquiry notice does not exercise due diligence by talking to the person who made the promise about the statement. When faced with contradictory information from. That's the inquiry notice. Yes, that's correct. Okay. That's correct. For example, if this was a situation where the allegation was, you got the statement, went to Mr. Watts, he explained it again and then he said, you know what? Don't even look at your statements again. I've got you covered. That's why I'm here. Go enjoy your retirement. You could still argue, and I think the case law supports that it's an objective, reasonable person test, but at least that gets you a little bit closer to saying, to your point, unsophisticated, small business owner. And I will point out that Mrs. Snapp was a real estate broker, not an Apple partner. But either way, I could see that that gets you a little closer. But in this case, at best, all they did, other than going back to the very source of the potential fraud, who just repeated the fraud, was to perhaps make a phone call. This may not be relevant to what notice they were on or what they did or shouldn't do. But since we're looking at it and you started to explain, can you explain to us what guaranteed benefit amount means? I can. Other than guaranteed benefit amount? I can. What that means, Your Honor, is the way these annuities work, when you buy an annuity, okay, you put in a certain amount. Let's say $250,000 for Mr. and Mrs. Snapp, some lower amount, maybe $350,000 and $250,000. That's what they invest in the annuity, okay? They also get what are known as credit. So basically, the $250,000 and the annuity company will credit them, say, another $25,000, okay? So that is their guaranteed amount. What that means is, one way or another, you will get that money back dollar for dollar. How do you get it back? Either through your monthly income payments, which draws down on that every month, or if that's not wiped out by the income payments, when the annuitant dies, the balance goes to whoever's designated as a death benefit. So the guarantee is... And this is total benefit. So another way, like, if we were going to be clearer about it, that would say guaranteed total benefit. And then you could figure, like, the remaining benefit is sort of the delta. Correct, correct. And I'm a little perplexed, and I think probably I can't ask this question, but I so want to know whether that's in the annuity contract. But don't answer that. Why is it that the annuity contract was not part of the motion to dismiss? Why is it not a... Why are we not looking at the annuity contract? Because my understanding is the nature of the claims did not challenge the contract at all. The contract functioned exactly as it was intended to function. It would be relevant at summary judgment, but we can't consider it at a motion to dismiss. I'm not even sure it would be relevant there, Your Honor, because they haven't challenged the annuity contract itself. They haven't said some term or condition in the contract was violated. But it would be relevant to their, like, reasonable reliance, right? I mean, so if in a theoretical world, you know, the contract on page one said in really big letters, and I'm sure it doesn't do this because no contract like this has big letters anywhere, right? But if it said big letters, right? Like, there is no guaranteed death benefit. The value of your, you know, benefits may well drop over time. And that was on page one. And then they started getting these statements that were consistent with that. Their reliance would seem less reasonable than without that fact. I think that's probably true. But again, given that they in fact say that the statements enough were enough to let us know that something was hinky here, something wasn't right. And they did nothing to pursue a reasonable investigation. And that's what Judge Dillon found. She didn't find that under no circumstances could this possibly ever be the case. She said, look, based upon a barrage, I think she called it, of statements from the horse's mouth, from the annuity company itself, that they understood to mean what Mr. Watts told me may not be true. Then at that point, you have an obligation to undertake a reasonable investigation. It's possible that a reasonable investigation would not have led the stats or an objected person to conclude that Mr. Watts was lying. I will submit that the actual complaint undermines that possibility entirely. Excuse me. You may recall that they allege in the complaint, pardon my allergies, they allege in their complaint that they first learned that Mr. Watts had misled them after his death in 2015, when they picked up the telephone, called Mr. Watts's office and spoke with Gina. And Gina told them exactly what was going on. Now, if it was that easy in 2015 to call somebody in the office, I think we can all agree that reasonable investigation requires more than simply, one, continuing to going back to the person about whom you have doubts. Or two, even if the court were to consider, it's not in the complaint, but if the court were to consider the allegation that came up after argument that Mrs. Snapp in fact did call the 800 number, that undermines their argument even more. Because number one, it shows as early as 2009, which is what they allege, she made that phone call. And it wasn't a phone call where someone said, we can't answer that for you. We're not going to answer that for you. Or yes, he's right. They simply said, go back and talk to your financial advisor. Mrs. Snapp then subsequently calls Mr. Watts and he tells them the same thing. Now, I can't imagine that if you're sufficiently concerned to call that number on day one, after speaking with Watts on day two, nothing's changed. You still have the same concern. You could have done any number of things, including going down to Mr. Watts' office, right down the street, confronting him about it and saying, you know what, let's do this. How about you and I right here in your office call the 1-800 number? Because you understand this better than I do. And you can talk it over and then figure it out. They could have gone to an accountant. They could have gone to anyone. Can I ask you, just to help me kind of make sense of this case, which does trouble me. So why do you think they didn't? You know, it seems like the most likely reason they didn't is because they were in fact persuaded by their broker. So then your argument would be, well, they were persuaded, but it was unreasonable for them to be persuaded. Is that the idea? I have two responses to that. If I stick only and accept only what's alleged in the complaint, I suppose it could be that they were sufficiently deferential, not reasonably deferential, but sufficiently personally deferential that they didn't want conflict. That, you know what, we're going to trust him. You know, I know. But that's not what you actually think, right? You're arguing that because you're stuck to the facts as alleged. I suspect that someone might say, I'm not saying you, that you believe they knew exactly what they got and that this is all made up after he died. My personal belief is exactly that, yes. Which would explain, you know, sort of the same set of motives. But that's not the situation we're under right now. We can't make that assumption. But to the extent we're trying to understand the mental state, that would be another perhaps more reasonable explanation for why these circumstances look like they look. Your Honor, I have perhaps not surprisingly struggled with that very question for a long time and doing this work for a long time. And with no disrespect to Mr. Greco or his clients, I have a hard time coming up with another explanation. But you're right. That's not what we're dealing with. Yes, I don't mean to. Yeah. I'm happy to address any of the other questions or any of the other, pardon me, doctrines, if the Court would like. I think we're fine. Thank you very much. Thank you very much. Mr. Greco. Your Honor, I wanted to address briefly counsel's argument that the complaint doesn't talk about guaranteed values and that they were sent out relying upon guaranteed values. Paragraph 12, which is Appendix 19, it states, the snaps read the paperwork and asked a lot of questions about the alleged guarantee. But Mr. Watts repeatedly falsely assured them that the annuity would not go below the initial payment. Then in paragraph 13, the same page. And everybody agrees, though, and maybe this is beyond the record that we have now, but at some level, everybody agrees there was a guarantee. The question is, was the guarantee a death benefit or an overall benefit? And so a reference here to this idea that they discussed the guarantee, everybody acknowledges that there was a guarantee. The question is, what was the guarantee? It's in paragraph 13. Mr. Watts repeatedly assured the snaps that their death benefit was still secure and it would not drop below the original amount invested. They were talking about this being a death benefit, a guarantee. And I think it's important to look back at this statement, which I agree with Judge Harris. I'm an attorney that does this kind of work. I don't understand these things. I don't know how anyone is supposed to understand these things. And I would submit that they're intentionally set out that way so that no one understands these things. But it says specifically, counsel's argument was that this guaranteed benefit amount, that was just from the very beginning to the end, you get this guaranteed benefit amount. We're here in 2011, so multiple years later. And it says specifically, your benefit values as of 11-09-2011. So it says you got this value as of this specific date. Right below that, it says guaranteed benefit amount, $370,000. So I would submit at the very least, it's misleading. But it certainly goes into the exact statements that the professional, that the river source said was a professional is telling my clients. And I think there's an important distinction. And I think this question sort of partly brought this out. There's an important distinction between inquiry notice versus discovery of fraud. The statute itself says the statute of limitation doesn't start running until the discovery of fraud, until it should have been discovered. So the question is not, should they have been on inquiry notice as to whether these values were changing and they should have inquired about it? The issue really from the statute is, should they have discovered a fraud as of that point? And I think that's an important distinction in a much higher level to say, not that these numbers are not making sense. They're not necessarily what I thought they were supposed to be. It's got to be the point that they discovered that this individual had defrauded them. And had specifically and allegedly stated them misstatements in relation to this particular product. And I would submit that- I'm back to Judge Richardson's question. I don't understand why the contract is not in the record because I guarantee you that the guaranteed death benefit is defined in that contract. And it may not mean what that statement said and they should have known better. Judge, again, and I think counsel is correct in that we're not making a contract claim that somehow maintains that the contract was breached in some way. But it's a definition of the guaranteed death benefit. I believe they're all in there, Judge. And it's probably, I think it's something that's probably about this thick and has a whole lot of language. Is that part of the record that you agree that River Source has not violated the contract? We do not maintain that they violated the contract. We maintain that we have some contract claims that's not related to the contract. There may be different issues, but you agree that River Source lived up to the contract that they made. You just think that they were fraudulently induced to get into that contract? Yes, Judge. An important another distinction, and again, this gets to the negligence claim. It gets to our claims. I wanted to get away from the fraud very briefly. And we have arguments as to why negligence was delayed in terms of the statute of limitation. Those claims in part are based upon suitability. So you're getting something aside that's misrepresentation, getting away from that, getting to just the very basic suitability. This man recommended to my clients in violation of FIN rules and violation of Virginia regulations in regards to annuities, a product that he claimed would do something for them that would be suitable for what they needed when in fact it was not. Now, I would submit that that gets away from this whole inquiry notice about fraud. Everything, we have arguments about obstruction and arguments about continuing representation, which generally applies to professionals. Well, here they said he's professional. So I would submit that that should apply as well. And then we also have the argument of equitable stop with simply a basic fairness as to whether they're stopped from using this bar in terms of my client's claims when their own agent, their own representative, who they told my client specifically in writing to go to when they had questions and talk to their investment professional, they should be barred from relying upon the misstatements that he made that prevented my clients from filing this case in a timely manner. Thank you very much. Thank you, Jim. We'll come down and greet counsel and then go to our final case.
judges: Henry F. Floyd, Pamela A. Harris, Julius N. Richardson